**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

COLE PINTER,                  )
                                         )
        Plaintiff,           )
                                         )     No. 1:14-CV-03863
v.                                   )
                                       )     Judge Jeffrey Cole
CAROLYN W. COLVIN        )
Acting Commissioner of Social Security,   )
                                         )
        Defendant.       )
                                         )

<u>**MEMORANDUM OPINION AND ORDER**</u>

The plaintiff, Cole Pinter ("Mr. Pinter"), seeks judicial review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"). 42 U.S.C. § 423(d)(2). Mr. Pinter asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision. For the reasons set forth below, Mr. Pinter's motion is GRANTED and the Commissioner's motion is DENIED.

## I.      PROCEDURAL HISTORY

Mr. Pinter applied for DIB on January 4, 2010, alleging a disability onset date of June 21, 2009, initially due to an ankle sprain, chronic knee pain and shoulder pain. (Administrative Record ("R.") 112-113). The claim was first denied on April 30, 2010 (R. 114). Mr. Pinter appealed the denial (R. 290-295), and amended the application to include several mental disabilities that he suffered from: Bipolar Disorder, anxiety, and

panic attacks. (R. 290). Upon reconsideration, the appeal was denied on December 30, 2010. (R. 121). Thereafter, Mr. Pinter filed a timely written request for a hearing before an administrative law judge on February 23, 2011. (R. 124-25). A video hearing was held on September 12, 2012 in Orland Park, Illinois. (R. 41). Administrative Law Judge ("ALJ") Karen Sayon presided over the hearing. Attorney Robert Williams represented Mr. Pinter. (R. 59). Mr. Pinter testified in Peru, Illinois, via a video teleconference. (R. 41). A vocational expert, Ms. Aimee Mowery, also testified at the hearing. (R. 101-107). On November 27, 2012, the ALJ issued an unfavorable decision finding that Mr. Pinter was not disabled under sections 216(i) and 223(d) of the Act (R. 38-52, 52) because he retained the capacity to perform a restricted range of light work. (R. 47-51). The ALJ determined that even though Mr. Pinter was unable to perform his past relevant work, jobs existed in significant numbers in the economy that he could still perform despite his postural and mental limitations. (R. 51-52). This became the final decision of the Commissioner when the Appeals Council denied Mr. Pinter's request for review of the decision on March 27, 2014. (R. 1-4, 1). Mr. Pinter appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c).

## II. THE EVIDENCE OF RECORD

### A. The Vocational Evidence

Mr. Pinter was born on June 14, 1983. He was twenty-five years old at the time of his alleged onset date and twenty-eight years old at the time of the ALJ's November 27, 2012 decision. (R. 66). Mr. Pinter quit school after the tenth grade. (R. 66). He worked

numerous jobs beginning in 2000, including working in a supermarket deli, as a delivery person for an auto parts store, loading and unloading trucks and as a guard of an impound lot. (R. 238, 72-74). At the time of the ALJ hearing, he lived with his girlfriend and her mother. (R. 632). Mr. Pinter testified that he spent his days at home on the computer playing games, reading conspiracy theory (R. 87 & 89), watching YouTube (R. 90), and attending group therapy twice a week (R. 87).

B.      The Medical Evidence

The medical record contains more than one thousand pages documenting the treatments Mr. Pinter received for his physical and mental impairments, dating from January 8, 2009 through September 4, 2012.

1.      Physical Health

Mr. Pinter's physical problems began with an injury to his right ankle (sprain), shoulder pain, hip pain and a hernia from which the initial request for DIB was filed with the Agency. (R. 112, 113, 229). Then, on May 15, 2010, Mr. Pinter was in an automotive accident. (R. 275). He fell off of an ATV he was driving and injured his leg (status-post tibia plateau fracture of the left leg). He underwent surgery on June 11, 2010 to repair the fractured leg. (R. 552). Mr. Pinter was confined to a wheelchair for approximately six months as a result of the leg injury. (R. 1193). He gained fifty pounds. (R. 293). In the disability report filed on July 3, 2010, he reported being in a wheel chair, having blood clots in his legs and a separated shoulder, as a result of the accident. (R. 275). He also mentioned that he was "depressed" by his injury. (R. 279).

The disability agency arranged for two consultative physical examinations and a Physical Residual Functional Capacity ("RFC") Assessment for Mr. Pinter. The first occurred on April 9, 2010 and was conducted by Dr. Samuel Wilchfort. Dr. Wilchfort reported normal findings. (R. 509-512). Dr. Marc Weber conducted the second exam on December 16, 2010 with similar "normal" findings. (R. 510). A Dr. Cirillo administered an RFC Assessment on April 29, 2010. (R. 513-520). The results of the assessment indicated that Mr. Pinter's limitations included: occasionally lifting no more than 20 pounds, frequently lifting no more than 10 pounds, standing or sitting no more than 6 hours per day in an 8-hour workday and to only occasionally climb ladders/ropes/scaffolding. (R. 514, 515). The ALJ found that Mr. Pinter suffered from a number of severe physical impairments: obesity; hernia; and status-post tibia plateau fracture of the left leg. (R. 43). (20 CFR 404.1520(c)).

2.      Mental Health

Mr. Pinter has been diagnosed with Bipolar Disorder, Personality Disorder and Major Depressive Disorder. (R. 626, R. 1116 ). Mr. Pinter's mental health problems began around the age of seven and worsened into adulthood. (R. 626). His parents divorced when he was two years old (R. 1186). He reports that his mother suffers from Bipolar Disorder. (R. 626). His mother and grandfather verbally abused him. (R. 1187). His father was an alcoholic who died when Mr. Pinter was nine years old. (R. 1055). As a child, Mr. Pinter was enrolled in special education classes. (R. 1197). He has been described as having a "low intellect." (R. 627). It has been noted that Mr. Pinter has a

"significant mental health history." (R. 1098). A doctor's report notes that Mr. Pinter underwent a psychiatric evaluation as early as December 30, 2008. (R. 371). In a January 2009 emergency room visit, he reported "feeling very anxious." (R. 371).

Mr. Pinter's anxiety symptoms worsened in May 2010, as a result of the motorcycle accident. (R. 645). He reports that he grew depressed by the physical pain he suffered from. (R. 1193, 645). The pain led him to have suicidal thoughts (suicidal ideation). (R. 1053, R. 1102). Mr. Pinter was first diagnosed with Bipolar Disorder and anxiety at Richard Hall Community Mental Health Center ("Richard Hall") in January of 2011. (R. 290). Mr. Pinter received a Psychiatric Evaluation, a Biopsychosocial Assessment and a Comprehensive Treatment Plan. (R. 625). In a form letter to the Office of Disability and Adjudication Review received on March 16, 2012, Mr. Pinter listed his mental problems as: "paranoid personality disorder, depression, anxiety and P.T.S.D." (R.310).

Mr. Pinter has been assigned Global Assessment of Functioning ("GAF") scores[1] ranging from 35 on the low end to 65 on the high end. (R. 1116, 1043). His most recent GAF scores suggest a severe impairment in Mr. Pinter's ability to work. Since June 2011, his GAF scores have not exceeded 40. In the psychiatric evaluation conducted at Richard Hall on March 2, 2011, the report indicated that his concentration and general knowledge

---

[1] Mr. Pinter was assigned the following thirteen GAF scores, in chronological order, from June 2011 – April 2012: 40 (R. 1052), 40 (R. 1062), 40 (R. 1072), 40 (R. 1077), 40 (R. 1091), 40 (R. 1096), 40 (R. 1110), 40 (R. 1128), 40 (R. 1133), 35 (R. 1145), 35 (R. 1153), 35 (R. 1162), 35 (R. 1175). A GAF score between 31-40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work, family relations, judgment, thinking, or mood (e.g., avoids friends, neglects family)." Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 32 (4th ed. text revision 2000) (hereinafter *"DSM–IV–TR"* ). A GAF score of 41-50 is defined as "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e .g., no friends, unable to keep a job)." *DSM–IV–TR,* at 34.

were impaired, that he was able to do serial 7's and simple calculations, and that his intellect was below average. (R. 627). There, he received a GAF score of 45. (R. 628). He was prescribed medication and told to continue biweekly therapy. (R. 628). In the Disability Report Appeal that he filed with the Agency (R. 290 – 295, 626, 627), he indicated his worsening mental health condition and stated that he suffered from Bipolar Disorder, and anxiety. (R. 290).

Mr. Pinter received mental health treatment from Richard Hall from April 2010 until May 2011. (R. 324). He described feeling "bad, aggressive and depressed." (R. 1040). The record shows that when Mr. Pinter relocated to Illinois, he continued outpatient treatment at North Central Behavioral Health Systems ("NCBHS") from June 2011 through September 2012. (R. 324, 325, 1236). Dr. Sami Mohammad, a consulting psychiatrist, was the doctor monitoring Mr. Pinter's treatment at NCBHS. Mr. Pinter attended thirty-four counseling sessions, twelve case management sessions, and received four medication evaluations at NCBHS. (R. 1116). The group facilitator of his Psycho-social Rehabilitation program reported that Mr. Pinter was "faithful in attendance, and has a desire to learn the skills to help him deal with his mental illness." (R. 1236). In his Biopsychosocial Assessment dated February 7, 2011, Mr. Pinter testified that he was "ready to face his past" and to "work on issues." (R. 637).

As a result of Mr. Pinter's mental impairments, he experiences difficulty sleeping. (R. 290). He sleeps approximately five hours per night (R. 626). He reports that he frequently experiences suicidal and homicidal ideation. (R. 626). He has not been hospitalized for mental health reasons. He did attempt suicide once, during the time he

was confined to a wheel chair, but his girlfriend stopped him. (R. 1078). He reports that he "lives for his girlfriend and pet lizard." (R. 1117).

Mr. Pinter's angry outbursts at work would result in him either walking off the job or being fired. (R. 95). He is impulsive, destructive of property and prone to fighting when in a manic state. (R. 1040). He was once arrested for fighting with his brother. (R. 95). Mr. Pinter's living situation has been unstable since the onset of his disabilities. He has been homeless, at times living in his truck. (R. 1040). At the time of hearing, Mr. Pinter lived at his girlfriend's house. (R.69).

Mr. Pinter's medical records detail that he has tried a number of different medications to help with the symptoms of his Bipolar Disorder, anxiety and depression, including Cymbalta, lithium, Seroquel and Wellbutrin. (R. 302, 626). These drugs helped lessen his suicidal urges (R. 97). He experienced numerous side effects from the medications including:   gaining fifty pounds and increased feelings of anger and drowsiness. (R. 626, 1078). At some point he stopped taking medication because of the unpleasant side effects. (R. ) In March of 2012, he was trying to get on other medications to help treat his severe depression, but needed Medicaid to cover the costs of the prescriptions. (R. 86, R. 302). The ALJ found that Pinter suffered from a number of severe mental impairments. (R. 43). The special impairments included: major depressive disorder; personality disorder, and alcohol abuse in apparent remission. (R. 43). (20 CFR 404.1520(c)).

C.      Administrative Hearing Testimony

1.      The Plaintiff's Testimony

Mr. Pinter testified that he gets frustrated easily and forgets things. (R. 86). On a typical day he wakes up, tries to find something to eat – sometimes – old lettuce, reads on his computer, plays computer games, watches documentaries and talks to a friend from his therapy group. (R. 89, 90). When asked by the ALJ about the frequency of his suicidal thoughts, he replied that he had suicidal thoughts every night since he was a child. (R. 99-100). "A lot of times wish I was, you know, not around." (R. 100). "I just don't relate to anybody at all." (R. 94).

2.      The Vocational Expert's Testimony

At the hearing, Ms. Amiee Mowery testified as a vocational expert. The ALJ posed eight hypotheticals. She started by asking the vocational expert to assume a person of the claimant's age, education, and work experience could perform light work involving occasional climbing of ladders, ropes or scaffolding; crouching, balancing, crawling, kneeling, stopping and climbing ramps or stairs; had mild restrictions of daily living, and moderate restrictions in social functioning and in concentration, pace, or persistence that meant the work could only involve simple instructions, routine tasks, simple, work-related decisions, and no public interaction. (R. 102-103). The vocational expert said that such a person could perform jobs like hand packager, of which there were 5,500 positions in the state and 19,800 nationally, an inspector (5,300 and 13,300), or a sorter (6,100 and 14,000). (R. 103-104). The ALJ asked whether work existed for an individual who was

off-task thirty percent[2] of the time due to a combination of his physical and mental problems. (R. 106). Not surprisingly, the vocational expert stated that "would eliminate the work." (R. 106). Similarly, no work was available for an individual who got into verbal arguments with a coworker or supervisor on a consistent monthly basis, or who more missed more than two days of work per month due to the person's medical condition. (R. 106).

D.    The ALJ's Decision

The ALJ determined that Mr. Pinter met the insured status requirements of the Act through December 31, 2014. (R. 43). The ALJ found he had not engaged in substantial gainful activity since June 21, 2009, the date of the alleged onset date (20 CFR 404.1571 *et seq*.). (R. 43). The ALJ was diligent to observe that Mr. Pinter had not included his obesity as a listed impairment and she added the factor into the assessment of his other impairments. (R. 44). She found that Mr. Pinter had the following impairments that at least in *combination*, were severe:    major depressive disorder; personality disorder; alcohol abuse in apparent remission; obesity; hernia and status-post tibia plateau fracture of the left leg (R. 43). The ALJ did not find Mr. Pinter's history of back or shoulder pain to be severe as neither caused "any more than minimal limitations on his ability to perform basic work-related activities." (R. 44).

---

[2]  It is not clear why the ALJ chose the thirty-percent figure. In the type of unskilled work the ALJ found Mr. Pinter could do, the cut-off would seem to be closer to ten or twelve percent. *See Durr-Irving v. Colvin*, 600 Fed.Appx. 998, 1001 (7th Cir. 2015); *Burnam v. Colvin*, 525 Fed.Appx. 461, 463 (7th Cir. 2013); *Schomas v. Colvin*, 732 F.3d 702, 706 (7th Cir. 2013). was specified by the ALJ. She did not specify a lower figure, like eight percent or six percent or twenty-six percent, etc.

1.     Overall Severity of Impairments

The ALJ found that none of his impairments met or medically equaled a listed impairment. *See* 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526. (R. 44-46). She noted that his medical records did not contain any medical opinions that his impairments met or equaled a listing. (R. 44). She determined that Mr. Pinter's musculoskeletal impairments did not meet the listings of 1.02 — covering major dysfunctions of a joint, 1.03 — covering reconstructive surgery or surgical arthrodesis of a major weight-bearing joint, 1.04 — covering disorders of the spine, or 1.08 — covering soft tissue injury. (R. 44-45). Mr. Pinter's cardiovascular impairments did not meet the listing of 4.00 — covering hypercholesterolemia, obesity, and chronic pain. (R. 45). Nor did Mr. Pinter's impairments fall within the 11.00 series for neurological disorders, specifically, 11.08 — covering spinal cord or nerve root lesions, 11.14 — covering peripheral neuropathies, 11.16 — covering cord degeneration, or 11.17 — covering degenerative disease not listed elsewhere. (R. 45). Lastly, the ALJ found that Mr. Pinter's mental impairments did not meet the criteria of those listed under 12.03 — covering schizophrenic, paranoid and other psychotic disorders,12.04— covering affective disorders ,12.06 — covering anxiety-related disorders, or 12.08 — covering personality disorders. (R. 45).

2.     Mental Impairments

The ALJ found that the severity of his mental impairments did not meet or equal a listed impairment. (R. 45).

a.     Activities of Mr. Pinter's daily life limitations.

The ALJ determined that in activities of daily living Mr. Pinter had no more than mild restrictions. (R. 45). She reasoned that his difficulties in daily life were due to

physical and financial reasons, and not due to a mental impairment based on pre-hearing function report Mr. Pinter submitted. (R. 256-263). The report she relied on in making the determination was filed in January 2010, which was prior to the ATV accident after which time Mr. Pinter's mental impairments had worsened significantly. In that report Mr. Pinter stated that he was not able to pay bills, handle a savings account, count change, or use a checkbook. (R. 45). She pointed out that he had the "ability to prepare meals, take medications without reminders, drive a car, go out alone, and shop in stores." (R. 45-46).

b.  Mr. Pinter's social functioning limitations.

The ALJ determined that Mr. Pinter's had moderate difficulties in social functioning by weighing all of the evidence of the record. (R. 46). She noted that his largest issue was his personality disorder and his inability to get along with others. (R. 46). She found that his condition was improving with medication and counseling. (R. 46). She pointed out that at the hearing Mr. Pinter acknowledged that these treatments were helping him feel better. (R. 50). She also concluded that his ability to maintain a relationship with his long-term girlfriend was an indication that his social functioning was not marked. (R. 50).

c.  Mr. Pinter's concentration, persistence, and pace.

The ALJ concluded that Mr. Pinter had moderate difficulties with regard to concentration, persistence, and pace. (R. 46). She relied on the same pre-hearing function report when making this determination. (R. 46, R. 256-263). She also relied on an outpatient evaluation from April 2010 that showed that Mr. Pinter's thought process and memory were normal and his judgment was reported as fair. (R. 661). She found that

Mr. Pinter's reported hobbies: playing video games, watching documentaries, and reading information on the internet, suggested that his mental impairments caused him even less difficulties, but she gave him "full benefit of the doubt" in consideration of his pain and the likely side effects of his medications. (R. 46).

        d.        Mr. Pinter's RFC.

With respect to Mr. Pinter's mental RFC, the ALJ concluded that Mr. Pinter's mental impairments did "not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration," and thus did not satisfy "paragraph B" criteria. (R. 47). She gave great weight to the two state agency medical consultant reports from April 2010 and December 2010 that opined that Mr. Pinter could perform light work (R. 49; R. 513; R. 588). She found that the opinions were consistent with the objective evidence of record. (R. 49). She factored in his history of hernias, knee impairment and his obesity in reducing the lifting capacity. Additionally, the ALJ made further limitations to accommodate his postural restrictions, giving him full benefit of the doubt. (R. 49). The ALJ acknowledged that she did not accommodate off of Mr. Pinter's alleged symptoms and limitations because she found him to be "not fully credible." (R. 50).

The ALJ then determined that Mr. Pinter had the capacity to perform light work except, he should: not climb ladders, ropes or scaffolds; and no more than occasionally balance, stoop, kneel, crouch, crawl and climb ramps and stairs. (R. 47-51). The work should involve simple instructions, routine tasks, only simple work-related decisions, no public interaction, only occasional interaction with supervisors and co-workers, and no tandem tasks. (R. 47). The ALJ concluded that based on the testimony of the vocational

expert, that Mr. Pinter was capable of performing work that exists in significant numbers in the economy, namely hand packager, an inspector, or sorter. (R. 52).

## III.   DISCUSSION

A.   The Standard of Review

We will uphold the ALJ's factual findings so long as they are supported by substantial evidence and not undermined by legal error. 42 U.S.C. §§ 405(g); *Back v. Barnhart*, 63 Fed. App'x. 254, 257 (7th Cir.2003). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir.2008); *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir.2008). The court is not permitted to reweigh the evidence, or to substitute is judgment for that of the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir.2009); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir.2000). A great deal of deference is afforded to the ALJ's decision so that even where reasonable minds may differ as to whether or not the plaintiff is disabled, the court must affirm the ALJ's decision if it is supported by substantial evidence. *Elder v. Astrue*, 529 F.3d 408 (7th Cir. 2009). However, conclusions of law are not entitled to that same level of deference. *Schmidt v. Astrue,* 496 F.3d 833, 841 (7th Cir.2007). Where the Commissioner commits an error of law, the court must reverse the decision. *Id.*

Despite the deference imparted to the Commissioner's decision, the court cannot act as a mere "rubber stamp." *Scott v. Barnhart*, 297 F. 3d 589, 593 (7th Cir.2002). The ALJ's decision must allow the court to assess the validity of the ALJ's findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir.2009). An ALJ is required to "minimally articulate" the reasons

for the ALJ's decision. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir.2005); *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir.2001). While the ALJ does not need to address every piece of evidence, the ALJ may not limit the discussion to include only evidence that supports the ALJ's ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir.1994). It has been described as a "lax" standard, but it is a standard nonetheless that the ALJ's decision must meet. When an ALJ denies benefits, the ALJ must build an "accurate and logical bridge from the evidence to the conclusion." *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir.1996); *Berger*, 516 F.3d at 544. Without that, the ALJ's decision cannot be upheld even if it is consistent with the medical evidence. *Sarchet*, 79 F.3d at 302.

B.      The Five-Step Sequential Analysis

Under the Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medical determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled, which requires the ALJ to evaluate:

(1) is the claimant currently unemployed;

(2) does the claimant have a severe impairment;

(3) does the claimant have an impairment that meets or equals one  of   the impairments listed as disabling in the appendix to the regulations;

(4) is the claimant unable to perform his past relevant work; and

(5) is the claimant unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir.2009); *Gibson v. Massanari*, 18 Fed. App'x. 420, 424 (7th Cir.2001). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. § 416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan*, 892 F.2d 43, 44 (7th Cir.1990). A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. § 404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352; *Brewer v. Charter*, 103 F.3d 1384, 1391 (7th Cir.1997). The fifth step requires the ALJ to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c); *Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003).

C.      Analysis

1.      Whether the ALJ "Played Doctor" in Making her Determination

Mr. Pinter argues that the ALJ "played doctor," relying on her own lay speculations about the nature and severity of Mr. Pinter's mental impairments, thus making an independent medical determination that the ALJ was not qualified to make. (Dkt. #14 at 1, 6). The theory is a familiar one brought by claimants denied disability status by the Commissioner. It is an argument that requires the reviewing judge to evaluate whether the ALJ substituted the ALJ's own judgment for a physician's without relying on other medical evidence on record. The Seventh Circuit has cautioned ALJs "not to succumb to

the temptation to play doctor." *See Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir.2012);

*Rohan v. Charter*, 98 F.3d 966, 970 (7th Cir.1996).

The ALJ is said to have impermissibly played doctor when the ALJ either rejects

a doctor's medical conclusion without other evidence, or when the ALJ draws medical

conclusions themselves about a claimant without relying on medical evidence. *Dixon*,

270 F.3d at 1177; *Green v. Apfel*, 204 F.3d 780, 781 (7th Cir.2000). Mr. Pinter contends

that the ALJ erred in her assessment of his mental capacity because she did not rely on a

mental health professional to evaluate his disability claim. (Dkt. #14 at 6). The Seventh

Circuit has said that ALJs and the legal profession often misunderstand mental illness.

*See Rohan*, 98 F.3d at 970. In *Wilder*, the court explained:

> Severe depression is not the blues. It is a mental illness; and health
> professionals, in particular psychiatrists, not lawyers or judges, are
> the experts on it. [A claimant] is entitled to a decision based on the
> record rather than a hunch. The salient fact of record is the
> testimony of the psychiatrist, a disinterested as well as expert
> witness. Everything else is rank conjecture.

64 F.3d at 337-338; *Rohan*, 98 F.3d at 970.[3] Here, the ALJ went with a hunch. An ALJ

must weigh the evidence, draw appropriate inferences from the evidence, and, where

necessary, resolve conflicting medical evidence. *Young v. Barnhart*, 362 F.3d 995, 1001

(7th Cir.2004).

      a.    An evidentiary gap was created when the ALJ failed to look at the
           GAF scores.

---

[3]     Judge Posner has observed that ALJs "are very uncomfortable about mental disease" and that "[m]ental diseases can be very seriously disabling even if a person isn't a raving maniac and needs to be put in a straitjacket." Patricia Manson, *Social Security ALJs in the Crosshairs*, CHI. DAILY L. BULL., Mar. 23, 2015.

Mr. Pinter was assigned GAF scores that would suggest that he is incapable of holding down a full-time job. While GAF scores are not outcome determinative of a disability, the problem here is the ALJ's complete failure to mention a single GAF score in her decision. *See Yurt v. Colvin*, 758 F.3d 850, 860 (7th Cir.2014)(" . . . the problem here is not the failure to individually weigh the low GAF scores but a larger tendency to ignore or discount evidence favorable to [plaintiff's] claim, which included GAF scores from multiple physicians suggesting a far lower level of functioning than that captured by the ALJ's hypothetical and mental RFC."); *Bates v. Colvin*, 736 F.3d 1093, 1099 n.3 (7th Cir.2013)(explaining "[w]e recognize that a low GAF score alone is insufficient to overturn an ALJ's finding of no disability . . . . In this case, however, taking the GAF scores in context helps reveal the ALJ's insufficient consideration of all the evidence . . . presented."). The majority of Mr. Pinter's GAF scores were between 35-40, indicating "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work, family relations, judgment, thinking, or mood (e.g., avoids friends, neglects family). *DSM–IV–TR,* at 32; *see supra*, text accompanying note 2.

How could the ALJ ignore all of Mr. Pinter's GAF scores? We do not know what impact those scores had on the ALJ or even if she considered them at all. Without any discussion of Mr. Pinter's collection of low GAF scores, we can have no idea what the ALJ thought about this evidence. *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012); *Clifford,* 227 F.3d at 873–74; *Godbey v. Apfel,* 238 F.3d 803, 808 (7th Cir.2000). Nevertheless, the government's response to the motion for summary remand attempts to inject the ALJ's reasoning for discounting the GAF scores, specifically the GAF scores

from Dr. Sami. (Dkt. #22 at 6-7). It cites to *Denton v. Astrue*, 596 F.3d 419 (7th Cir.2010), arguing that the score does not reflect the clinician's opinion of functional capacity -- "nowhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score." *Denton*, 596 F.3d at 425. They also point out that in *Williams v. Colvin*, 757 F.3d 610 (7th Cir.2014), the court noted that the most recent edition of the *Diagnostic and Statistical Manual of Mental Disorders* abandoned the GAF scale because of "its conceptual lack of clarity ... and questionable psychometrics in routine practice." *Williams*, 757 F.3d at 613 (*quoting* the American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed.2013)). At the time of the ALJ's decision, it was not yet abandoned, and the scores cannot simply be ignored. *Voigt v. Colvin*, 781 F.3d 871, 874 (7th Cir.2015).

Furthermore, by making this argument, the government has violated the *Chenery* doctrine. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943); (Dkt. #22 at 6-7). As the Commissioner knows, an agency's lawyer is forbidden to defend the agency's decision on grounds that the agency itself had not embraced. E.g., *Park v. Astrue*, 597 F.3d 920, 922 (7th Cir.2010); *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir.2009)(per curiam); *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir.2006). The government has been scolded many times and threatened with sanctions for its repeated violation of this doctrine. *Hanson v. Colvin*, 760 F.3d 759, 762 (7th Cir.2014) ("[w]e are particularly concerned about the Chenery violations committed by the government because it is a recurrent feature of the government's defense of denials of social security disability benefits, as this court has noted repeatedly"); *Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir.2014); *Hughes v.*

*Astrue*, 705 F.3d 276, 279 (7th Cir.2013). All to no avail. We shall not review reasoning not supplied by the ALJ in her decision. *Durr-Irving v. Colvin*, 13-3275, 2015 WL 367138, at *6 (7th Cir. Jan. 29, 2015).

>    b.    Substantial evidence does not support the ALJ's determination that Mr. Pinter is not disabled.

>    *i. The Government's argument*

The Commissioner argues that substantial evidence supports the ALJ's RFC findings and the weight she gave to the medical source opinions. (Dkt. #22 at 3). The government points to cases holding that "[a]n ALJ is not required to accept a doctor's opinion if it is 'brief, conclusory, and inadequately supported by clinical finding.'" *Gildon v. Astrue*, No. 260 F.App'x 927, 929 (7th Cir.2008); *see also Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir.2000). The ALJ's decision does not mention the medical opinion of Dr. Sami to refute it. (R. 50). Additionally, the ALJ did not ask to have Mr. Pinter evaluated by an independent mental health examiner regarding his mental impairments, nor did she have a medical expert testify at the hearing (Dkt. #14 at 6). To that, the government argues, without citing to any supporting case law, that the burden was still on Mr. Pinter to supply more evidence to establish his mental impairments. (Dkt. #22 at 4). The argument is unpersuasive.

Mr. Pinter's medical file consists of more than 1000 pages of doctors' notes, the bulk of which pertain to Mr. Pinter's mental health problem. If the ALJ required an independent review of Mr. Pinter's mental health record, she should have arranged for one. *Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir.2004); *see Clifford*, 227 F.3d at 873 (if the ALJ believes that he lacks sufficient evidence to make a decision,

the ALJ must adequately develop the record and, if necessary, obtain expert opinions); *Nelson v. Apfel*, 131 F.3d 1228, 1235 (7th Cir.1997); *Henderson v. Apfel,* 179 F.3d 507, 513 (7th Cir.1999); 20 C.F.R. § 416.912(d) (2000).

It appears that the ALJ simply ignored Mr. Pinter's collection of exceedingly low GAF scores, which prevented an informed review. *See Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir.2001) ("an ALJ may not ignore an entire line of evidence that is contrary to her findings"); *Henderson*, 179 F.3d at 514; *See Herron*, 19 F.3d at 334 (an ALJ may not dismiss medical evidence without explaining why the ALJ reached that conclusion). The low GAF scores suggest a far lower level of functioning than what was captured by the ALJ's hypothetical and mental RFC. *Yurt*, 758 F.3d at 860; *see Bates*, 736 F.3d at 1100 (low GAF score alone is insufficient to overturn ALJ's finding of no disability but GAF scores in context revealed ALJ's deficient consideration of entirety of claimant's evidence). The ALJ was highly selective in the use of the medical record to support her conclusion. Such cherry-picking of the medical record is forbidden. *Czarnecki v. Colvin,* 595 Fed. App'x. 635, 643 (7th Cir.2015); *Yurt*, 758 F.3d at 859. Instead of discussing the GAF scores, the ALJ relied on evidence that favored her conclusion, such as function reports that pre-dated Mr. Pinter's worsening mental impairments being diagnosed to support her finding of not disabled. (R. 256-263 & 282-289). She ignored the evidence of the GAF scores and belittled his documented mental symptoms. *Phillips v. Astrue*, 413 F. App'x. 878, 885 (7th Cir.2010).

We see the ALJ cherry-picking not only as it relates to the GAF scores, but to other evidence in the record. The ALJ uses the fact that Mr. Pinter was able to perform serial 7's to indicate his ability to adequately maintain concentration, pace and

persistence. (R. 46). In the end, she found him moderately impaired. (R. 46). However, she ignores the fact that the record shows that Leslie Hay, APRN, who conducted the psychiatric evaluation opined that Mr. Pinter had a moderate risk of attempting suicide, a moderate risk of becoming violent, and that his concentration was impaired. (R. 627). Many mental illnesses are characterized by "good days and bad days," rapid fluctuations in mood, or recurrent cycles of waxing and waning symptom. *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008); *Phillips*, 413 F. App'x. at 886. Mr. Pinter's ability to function better one day does not eliminate an inability to function on "bad" days. The ALJ's decision does not reflect that she took into account his "bad" days.

## ii. The RFC determination

The ALJ's failure to incorporate adequately Mr. Pinter's mental impairments into the RFC is problematic. *Arnett*, 676 F.3d at 592. The ALJ determined that his social functioning limited his RFC only moderately, despite noting his anger issues, homicidal thoughts, and inability to get along with other people. (R. 46). She reasoned that Mr. Pinter acknowledged he was improving with medications and therapy, along with the fact that he had maintained a long-term relationship with his girlfriend and that he got along with members of his therapy group. (R. 46, R. 50). She also pointed out that Mr. Pinter received a ride to his hearing by a fellow therapy member. (R. 46). That is not to say that those factors are not grounds for making such an RFC determination; it is just to say that the ALJ may not only look at the evidence that supports her conclusion. *Scrogham v. Colvin*, 765 F.3d 685, 696 (7th Cir.2014); *Herron*, 19 F.3d at 333 ("[o]ur cases consistently recognize that meaningful appellate review requires the ALJ to articulate reasons for accepting or rejecting entire lines of evidence").

Additionally, the ALJ failed to explain how Mr. Pinter's ability to perform these tasks at home, alone, at his own pace translates to an ability to perform work tasks around others on a full-time, competitive basis. (Dkt. #14 at 11); *see Beardsley v. Colvin*, 758 F.3d 834, 838 (7th Cir.2014); *Clifford,* 227 F.3d at 872 (describing that "minimal daily activities" such as preparing simple meals, weekly grocery shopping, taking care of family member, and playing cards "do not establish that a person is capable of engaging in substantial physical activity"); SSR 96–7p (claimants may sometimes have structured daily activities to minimize symptoms and avoid physical and mental stressors). The ALJ gave    Mr. Pinter only mild restrictions on rating his daily living activities. (R. 45). She based her determination on an early function report from January 2010. (R. 45-46, R. 256-263). The function report pre-dates Mr. Pinter's amended application where he lists documents his mental impairments, including bipolar disorder, anxiety, trouble remembering, an inability to sleep, and panic attacks. (R. 290). The ALJ ignored those statements and instead focused on Mr. Pinter's statement in an earlier function report where Mr. Pinter's said he prepared meals (sandwiches and frozen meals), took medication without a reminder, drove a car, and went out alone and to shop. (R. 258).

Here, the ALJ did succumb to playing doctor regarding Mr. Pinter's mental impairments by relying on her lay speculations of depression, anxiety and Bipolar disorder. This is evidenced by the ALJ's statement that Mr. Pinter prepares meals. But that ignores the reality and extent of his capabilities: he is not preparing an elaborate feast; on the contrary, the record shows that Mr. Pinter prepared frozen meals, made sandwiches and that he ate an "old piece of lettuce." (R.258, R. 89). On the face of it, the ALJ uses both the favorable and the unfavorable evidence to determine that Mr. Pinter

mental impairments are not more limiting. She reasoned that although he had many visits to the ER and complaints of suicidal ideation, he was never admitted to a psychiatric ward and was never recommended to receive more intense treatment. (R. 50, R. 1053). So what. Not being institutionalized does not equal not being disabled. *Voigt*, 781 F.3d at 876. An ALJ is not competent to make the kind of medical conjecture she did. *Id.*; *see Browning v. Colvin*, 766 F.3d 702, 705 (7th Cir.2014). The ALJ's conclusion had no supporting evidence. It is the sort of classic playing doctor that the law forbids. *Murphy*, 496 F.3d at 634. The ALJ relied on her own understanding of mental health and not on the opinion of a medical expert or other medical evidence.

It is worth pointing out that the ALJ assigned Mr. Pinter an RFC to perform simple work, which may not have accounted for his limitations in concentration, persistence, and pace. (R. 47). The act of packing, sorting, and inspecting all seem like jobs where an employee's focus cannot wander very much. *See* www.occupationalinfo.org/onet/92974.html (packaging requires perceptual speed, dexterity, etc.). The only mention the ALJ made to concentration was in the hypothetical to the vocational expert where an individual is off-task thirty percent or even more of the time and that eliminated all work. (R. 106). We have no evidence to suggest that, nor does the ALJ explain how Mr. Pinter is capable of being on-task seventy percent of the time given his mental impairments. The ALJ did not ask the vocational expert to determine the effect of a person being off-task say twenty percent of the time would have on the availability of work. (R. 106). We do not know how high a percentage an individual can be off-task and still keep a job as a packager, sorter, or inspector. The court has frequently rejected the notion that a hypothetical like the one here that assigns

the claimant to simple, routine tasks and limited interactions with others adequately captures deficiencies and limitations in concentration, persistence and pace. *Stewart*, 561 F.3d at 685; *Craft*, 539 F.3d at 677–78 (limiting hypothetical to simple, unskilled work does not account for claimant's difficulty with memory, concentration, or mood swings); *Ramirez v. Barnhart*, 372 F.3d 546, 554 (7th Cir.2004) (describing that a hypothetical restriction to simple one or two-step tasks does not account for limitations of concentration).

For instance, the RFC does not appear to account for Mr. Pinter's below-average intelligence. (R. 627). *Stewart*, 561 F.3d at 684 (the hypothetical must include all limitations supported by medical evidence in the record); *Kasarsky v. Barnhart*, 335 F.3d 539, 544 (7th Cir. 2003)(constructing hypothetical question about a person with borderline intelligence does not account for deficiencies in concentration resulting in a remand). Further, the ALJ's hypothetical and the RFC do not adequately capture his temperamental deficiencies and limitations in concentration, persistence, and pace. *Yurt*, 758 F.3d at 858-59; *Craft*, 539 F.3d at 677-78. The ALJ had the burden of discussing evidence that demonstrates that other work exists in significant numbers in the national economy that Mr. Pinter could do, given his residual functional capacity, age, education and work experience. 20 C.F.R. §§ 404.1512(g) and 404.1560(c). The ALJ did not do so. Since the record does not indicate that the ALJ properly considered the aggregate effect of all of Mr. Pinter's mental impairments, a remand is required for a redetermination of Mr. Pinter's residual functional capacity. The ALJ could have—and must on remand—fill in the evidentiary deficit either by obtaining the opinion of an independent examining psychiatrist or a mental health expert or by seeking more information from Dr. Sami.

2.      Whether the ALJ's Credibility Determination is "Patently Wrong"

An ALJ's credibility finding is typically entitled to substantial deference, unless the appellant demonstrates that it is "patently wrong." *Schomas v. Colvin*, 732 F.3d 702, 708 (7th Cir.2013); *Powers*, 207 F.3d at 435. The ALJ's credibility determination must include reasons for the finding that are supported by record evidence and must be specific enough to show the weight the ALJ gave to the claimant's testimony. *Zurawski,* 245 F.3d at 887 (*citing* Social Security Ruling 96–7p); *Gibson*, 18 Fed. App'x. at 426. An ALJ's credibility determination is accorded 'special deference,' as long as the record supports it. *Anderson v. Barnardt*, 175 Fed. App'x. 749, 754 (7th Cir.2006). The ALJ must take a number of factors into account, including the objective medical evidence, descriptions of the symptoms, treatments used to assuage those symptoms, and the daily activities of the claimant. *Terry*, 580 F.3d at 477; *Simila*, 573 F.3d at 517; 20 C.F.R. § 404.1529(c)(2)-(4). It is a "high burden" to demonstrate that a credibility determination is patently wrong. *Turner v. Astrue*, 390 Fed. App'x. 581, 587 (7th Cir.2010).

Mr. Pinter asserts the credibility finding is "patently wrong" based on the four factors that the ALJ relied on to support her conclusion. (Dkt. #23 at 5). The ALJ noted that she did not accommodate all of Mr. Pinter's alleged symptoms and limitations "to the extent that they would be inconsistent" with the RFC she assigned Mr. Pinter. (R.50). An ALJ's determination regarding a Claimant's credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96–7p, at *2. When there is no further explanation, the Seventh Circuit

invariably condemns such language as "meaningless boilerplate." *Pierce*, 739 F.3d at 1050. Although the ALJ followed the boilerplate conclusion with detailed explanations of the evidence and her reasoning for finding him not fully credible, the problem is that the explanations show that the ALJ's credibility finding misstated some important evidence and misunderstood the import of other evidence.

First, the ALJ determined that Mr. Pinter was not fully credible because he rode an ATV when allegedly disabled (a jarring activity). (R.50). Next, she found that since he prepared meals, took medications without reminders, drove a car, went shopping, played video games, and watched documentaries, Mr. Pinter was not disabled. (R. 50). Then, the ALJ factored in that Mr. Pinter made inconsistent statements regarding his alcohol use and the frequency at which he went fishing. (R. 50). Lastly, the ALJ said that Mr. Pinter's receipt of unemployment benefits for the fourth quarter of 2010 and the first quarter of 2011, though not dispositive, was a factor in her determination that he was not credible because, in order to receive benefits, the applicant must testify he is able to work. (R. 50-51).

The fact that Mr. Pinter drove an ATV, played video games, prepared meals and went fishing does not translate into the ability to work full-time. *Pierce*, 739 F.3d at 1050 (ALJ erred by concluding that claimant should be able to work full-time because she "often" worked for longer than five hours per day). Mr. Pinter's ability to do online research or play video games does not require the same amount of concentration that is required for full-time employment. *Voigt*, 781 F.3d at 878. An ALJ's assertion that a claimant's "ability to watch television for several hours indicates a long attention span" is not supported. *Powers,* 207 F.3d at 435. The ALJ mischaracterized the activities that she

relied on in her determination. For instance, Mr. Pinter testified that he ate "old lettuce" which does not equate to "preparing meals." (R. 89). *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir.2002) (remanding where ALJ mischaracterized record). This is not to say the ALJ missed the boat entirely because the ALJ did make some valid observations.

We agree with the ALJ that based on the record, Mr. Pinter was inconsistent in his testimony regarding his alcohol consumption and fishing history. (R. 50). At the hearing, he reported that he stopped drinking when he lost his job on the alleged onset date. This contradicts a September 2011 medical report where Mr. Pinter told a treating source that he stopped heavy drinking six months earlier (R. 50). *Simila*, 573 F.3d at 516. Where an ALJ's credibility determination has evidentiary support, it is not patently wrong. *Jens v. Barnhart*, 347 F.3d 209, 213-14 (7th Cir. 2003).

We also find no error with the ALJ supporting her conclusion with evidence that Mr. Pinter certified that he was ready, able, and willing to work in order to receive unemployment benefits. *Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir.2005)(receipt of "employment is not proof positive of ability to work," but may play a role in assessing his subjective complaints of disability). On the one hand, in applying for unemployment, Mr. Pinter represented to the relevant state authorities that he was available to work and actively seeking employment. On the other hand, he is alleged to the federal government that he is unable to work because he is disabled. Which statement is to be believed? One could imagine a claimant being forced to seek employment while awaiting a decision from Social Security. However, Mr. Pinter does not argue that he was forced into seeking employment by desperate financial straits. In this case, the ALJ regarded Mr. Pinter's

receipt of unemployment benefits as one of many factors adversely impacting his credibility. *Id.* (R. 50-51). That as patently wrong.

So, the ALJ did articulate some legitimate reasons for her adverse credibility determination based on inconsistencies of his testimony and his receipt of unemployment benefits, but substantial evidence does not support her negative credibility finding as it pertains to the activities he engaged since the alleged onset date.

## V. CONCLUSION

Mr. Pinter's motion for remand [Dkt. #14] is GRANTED, and the Commissioner's motion for summary judgment [Dkt. # 22] is DENIED.

**ENTERED:** _____
UI̲                              J̲DGE

**DATE:** 6/22/15